17055

BRUCE SMITH, Adm'r, Appellant, v. CANAL INSURANCE COMPANY and MACK D. SMITH, d/b/a Mack Smith Cab Company, Respondents

(88 S. E. (2d) 780)

46

*Messrs. Mann & Mann,* and *Clement L. McEachern,* of Greenville, *for Appellant,*

*Messrs. Leatherwood, Walker, Todd & Mann,* of Greenville, and *W. G. Acker,* of Pickens, *for Respondent,*

August 15, 1955.

STUKES, Justice.

The jury returned verdict in favor of the above plaintiff, now appellant, for five thousand dollars damages for the alleged wrongful death of his intestate. Code of 1952, Section 10-1951. Upon respondents' motion the trial court set the verdict aside and rendered judgment for them (the defendants) notwithstanding the verdict, upon the ground that appellant's intestate was guilty of contributory negligence as a matter of law. This appeal followed.

A taxicab, which was owned by the respondent Smith and for the operation of which respondent Canal Insurance Company had furnished liability insurance pursuant to statute, was driven by one Alexander and was on a trip from Greenville toward Easley. About one hundred and fifty feet beyond the bridge over the Saluda River on Alternate U. S. Highway 123, shortly after midnight, it struck the pedestrian decedent and inflicted injuries from which he died within a few hours. The bridge is eighteen feet wide, the highway of concrete twenty feet wide with asphalt shoulders on both sides which were estimated to be two to four feet in width. The road and bridge are practically straight from the point of the collision for a distance of several hundred feet in the direction of the cab's approach; as said, it was 150 feet to the bridge which, itself, is 300 feet long and the road continues straight for some distance beyond, which clearly appears from the pictures which were respondents' exhibits.

Negligence in the operation of the cab was alleged in the complaint, specifically as follows: (a) high and unreasonable speed at the time and place and under the circumstances; (b) failing to keep a proper lookout; (c) lack of proper control; (d) inefficient lights; (e) striking decedent when he was practically across the highway without effort to swerve or avoid him; (f) failing to apply the brakes; (g) that the cab driver was under the influence of

intoxicants; and (h) failure of effort to avoid striking decedent, quoting, "who was in the act of lawfully crossing said highway and was seen, or should have been seen, by the driver of said taxicab." At the conclusion of the evidence and on motion of respondents the court declined to direct a verdict in their favor but struck out, for lack of supporting evidence, specifications (a), (d), and (g), which related to the speed and lights of the cab and the intoxication of the driver.

The answer consisted of a general denial, except of the formal allegations of the complaint, and of the plea of contributory negligence of the decedent, who, it was alleged, was in an intoxicated condition and suddenly walked or ran across the heavily traveled highway, in the path of moving vehicles, and without any lookout or other care for his safety.

The accident happened almost, if not quite, opposite, on the other side of the highway from, a motor court in which drinks were served and a young woman who worked there as a waitress testified for appellant. She said they had just closed at midnight and she was standing in the door of the office. She saw the decedent in the place earlier in the evening, and she saw him standing on the side of the curb, "next to the curbing of the road," but she also testified that he was standing "over on the shoulder" about forty or fifty feet away and across the road from her. She did not see him cross the road. She saw the cab come over the bridge. It struck decedent, threw him into the air and into the ditch. She did not hear any signal from the cab. On cross examination she testified that the decedent was in the motor court at about nine o'clock and on account of the things he said to her, the proprietor asked him to leave the premises, which he did: He acted "sorta" like he was drunk but she could not say that he was. He was last in the place at about 10:30 o'clock. This witness had previously signed a statement for an insurance adjuster who was investigating the accident soon afterward. In it she said that decedent, whom she did

not know before, was in the motor court at about nine o'clock on the evening of the accident and when she passed him in waiting on customers he would "grab" her and she finally shouted at him and the proprietor put him outside. She could tell that he had been drinking because she, quoting, "could smell it on him and he looked wild-eyed." He ordered beer which the proprietor refused to serve him. He came back in later and the proprietor put him out again at about eleven o'clock, and she did not see him again until after the place closed. After they closed she was standing at the door of the front room and heard a noise on the highway and opened the door to see what had happened. At that time the proprietor had driven his station wagon out and he and others were putting the decedent in it. She went with them to take decedent to the hospital. On the way she recognized him as the man who had earlier annoyed her. The witness denied much of this former statement and could not remember saying some of the things that were in it although she admitted giving a statement and verified some of its contents, but she said she did not read it before signing. (It consisted of three pages, only the last of which bore her signature; the other pages were not signed or initialed and no witness signed it.) She testified that the cab proceeded for close to fifty feet before stopping after striking decedent; the lights on the cab were burning and the moon was shining. On redirect examination she said that the deceased put up no argument when asked to leave the court, walked straight out and knew what he was doing.

Decedent's brother was a witness for appellant. He interviewed the cab driver soon after the accident and the latter told him that he was about four feet from decedent before he saw him and was driving thirty-eight or forty miles an hour and could not have stopped. The witness examined the cab and found the front headlight broken and a dent on the right side of the hood about the size of his hand, about two feet from the front. The driver also told him that if decedent had taken one more step the cab would have missed him.

A witness for respondents was at the front and outside of the motor court when the collision occurred. He saw the approaching taxicab and estimated the speed at thirty-five to forty miles an hour, with its lights burning. He saw decedent walking on the highway, "angling-like" toward the bridge and across the center line of the highway. He was not on the shoulder of the road. The cab did not proceed far and he did not hear it skid from braking. The front door of the motor court was not open. As far as he could remember, it was a dark night. He heard no signal from the cab. The witness had been drinking beer. He thought decedent was staggering a little as he walked across the highway.

A passenger in the front seat of the cab, who was the cousin of decedent, testified for respondents. He said that the cab was running at a moderate speed, thirty or thirty-five miles an hour, and the lights were good. He first saw decedent in front of the cab when it was within five or six feet of him and decedent was running straight across the highway. The cab was stopped in about the length of it. It was on the concrete portion of the highway and decedent had reached the edge of the concrete. The cab driver was watching the road and had met two other cars on the bridge, for which he dimmed his lights but they did not appear to dim theirs. It was a dark night and had rained earlier but the road had dried. The witness had a can of beer at about ten o'clock. He recognized decedent and did not get out of the cab after the accident because he did not want to see his cousin in his injured condition. He accompanied the cab driver to the hospital but still did not get out of the cab. He was later taken to his home near Liberty and he and the cab driver notified decedent's brother of the accident.

The insurance adjuster or investigator testified for respondents that he investigated the accident and interviewed the young woman at the motor court, whose statement he took and who was appellant's witness. (Her testimony is summarized above.) After the statement was reduced to

writing in the presence of the wife of the proprietor of the motor court it was read at least twice by the maker who also asked the wife of the proprietor to read it before it was signed. It was composed of the maker's answers to questions by the witness and the words of the statement were hers.

Alexander, the driver of the cab, testified that its lights and brakes were in good condition. He had nothing to drink on the day of the accident. His passenger (whose testimony is stated above) was on the front seat of the cab. Its speed was between thirty-five and forty miles an hour and the witness had it under control. He met two cars on the bridge and dimmed his lights. At the end of the bridge there is a decline in the elevation of the road and after twenty to thirty feet it begins to rise. The cab was six feet from decedent when the witness saw him crossing the road in front of it and near the right side of the cab. He was on the concrete portion of the road and not on the shoulder; the right headlight struck him. The collision occurred by the time the witness could get his foot on the brakes and he stopped the cab in not much over a car length, got out and went back to decedent. A car with bright lights going fast was met after the witness cleared the bridge. It was a dark night and there were no lights in the motor court. The road had dried after an earlier rain. The cab was driven on the concrete portion of the highway, to the right of the center. He repeated on cross examination that at the time of the collision he was meeting another car and did not see decedent until he was within five or six feet of him; but the lights of the other car did not interfere with his view of the road. Decedent was walking and if he had taken one more step there would have been no collision. He was not on the shoulder of the road and had he been, there would likewise have been no collision.

The photographer who made pictures of the scene which were introduced in evidence by respondents also made certain measurements and testified to them. The bridge is eighteen feet wide, the concrete portion of the highway is

twenty feet in width. It is one hundred and fifty feet from the end of the bridge to a point on the highway directly in front of the stoop of the motor court. From the stoop to the edge of the concrete highway is thirty feet. From the center of the bridge there is a decline which continues twenty-four feet from the end of the bridge, then begins an incline, which the pictures show.

Another taxi driver testified for respondents. He happened to be following the cab which was in the accident, with one car between them, and he was at the edge of the bridge when the collision occurred. He met other cars as he crossed the bridge; his speed was about thirty-five miles an hour, which was that of respondents' cab. The latter proceeded ten or twelve feet beyond where decedent lay after the collision. The car ahead of the witness went on but he stopped. It had previously rained and the night was foggy and dark. The motor court was closed and without lights at the front but there was one inside which the witness saw.

The respondent Smith testified that he owned the cab, a Chevrolet sedan, which was in good mechanical condition. He has his cabs checked periodically. He went to the hospital when he heard of the accident, examined the cab driver and determined that he was not drinking. The cab was equipped with front and rear bumpers and bumper guards, and the headlights were in the front ends of the fenders.

The evidence which is pertinent to the appeal has been rather fully reviewed for, of course, the issue largely depends upon it. Because of the nature of respondent's motion, which was granted and the verdict for plaintiff-appellant set aside, the evidence must be considered in the light most favorable to appellant, and thereby we conclude that the issues of negligence and contributory negligence were properly submitted to the jury and their verdict should be allowed to stand. They were the arbiters of the questions of fact which arose from the evidence.

In the order under appeal, which set aside the verdict, ■ the court properly assumed that the driver of the cab was guilty of negligence which was a proximate cause of the collision. His testimony that he did not see the deceased until within five or six feet of him despite the absence of obstructions and the fact that his headlights were good and the road straight, is easily susceptible of reasonable inference of negligent lookout whereby the driver failed to avert the accident by signal, brakes or slight change of his course. His half of the twenty-foot concrete road gave him room to have turned to his left sufficiently to have avoided the deceased without entering the other traffic lane, even if deceased was on the edge of the concrete, but, according to his own testimony, he did not see him in time to do anything.

However, the court concluded as said above that ■ the evidence showed, as matter of law, that the deceased was guilty of contributory negligence, even conceding that he was on the shoulder of the road when hit by the cab. The court's conception of the evidence in this connection is shown by the following excerpt from the order:

"The plaintiff's evidence * * * stated most favorably to the plaintiff, as it must be on such a motion as this, showed that James Hawkins was standing on the asphalt portion of Alternate U. S. Highway 123 on the North side thereof between 140 and 150 feet West of the Pickens County end of the Saluda River Bridge. The road is paved with concrete 18 feet (20 feet according to the evidence—interpolated) wide and has an additional strip on each side paved with black top some two or three feet wide."

Contrary to the view of the trial court, we think that if the deceased was on the shoulder of the road when struck, he was not, as a matter of law, guilty of negligence which contributed to his injury as a proximate cause. When the trial court decided on the motion that he was, in his failure

to get out of the way of the cab, the court invaded the province of the jury.

Appellant's professed eyewitness who placed the deceased on the shoulder of the road was contradicted by other witnesses and by her claimed prior statement; but it was for the jury to find the truth and accept or reject such of the testimony as they credited or discredited. It is axiomatic that the credibility of the witnesses is for determination by the jury.

The argument of respondents is largely based on the provisions of our statutes, to which we turn.

The first sentence of Sec. 46-435 of the Code of 1952 follows:

"Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield .the right of way to all vehicles upon the roadway."

Sec. 46-436:

"Where sidewalks are provided it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway. Where sidewalks are not provided any pedestrian walking along and upon a highway shall when practicable walk only on the left side of the roadway or its shoulder facing traffic which may approach from the opposite direction."

Sec. 46-442:

"Notwithstanding the provisions of this article every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and shall give warning by sounding the horn when necessary and shall exercise proper precaution upon observing any child or any confused or incapacitated person upon a roadway."

In *Drag v. Ellis,* 207 S. C. 416, 36 S. E. (2d) 73, 74, this court considered the traffic ordinances of the City of Charleston, subdivision (a) of which is identical with the

above quotation from Sec. 46-435 of the Code, which is invoked here; and subdivision (b) of the ordinance is identical with Code Sec. 46-442, which is also quoted above. Verdict for the plaintiff-pedestrian, who was struck by an automobile between street intersections, was affirmed, and we said: "It is seen that there is no prohibition of jay-walking, that is crossing a street between corners, and the requirement of the yielding of the right-of-way under such circumstances to vehicles is qualified immediately in the ordinance by the injunctions upon drivers which are contained in subdivision (b). In view of the contents of the ordinances they appear to add little, if anything, to the ordinarily applicable common law."

A prior statute similar in its terms to the present Sec. 46-435, was applicable to the facts in *Spearman v. Couch,* 218 S. C. 430, 63 S. E. (2d) 161, where verdict for plaintiff was affirmed. He was struck by a motor vehicle when he had only one foot off the curb and in the street. It was not held that he was guilty of contributory negligence as a matter of law because of his failure to yield the right of way as provided by the statute but, on the contrary, that it was for the jury to say whether he was contributorily negligent. Affirmance of the verdict was further based upon the ground that the driver may reasonably have been found to have been guilty of gross negligence because of his excessive speed at the time and place of the accident. And in *Myers v. Evans,* 225 S. C. 80, 81 S. E. (2d) 32, Sec. 46-435 was referred to but found to be inapplicable to the unusual facts of that case.

The present statutes, before codification in the Code of 1952, were applicable to the facts, and were cited, in *Dawson v. South Carolina Power Co.,* 220 S. C. 26, 66 S. E. (2d) 322, but recovery for the death of a pedestrian when struck by a bus on the highway was affirmed. Other, earlier pedestrian cases were cited and reviewed. It was said in the opinion that it may have been reasonably inferred from the evidence that the deceased undertook to yield the right of

way, which we think may also be said of the evidence here because of the eyewitness testimony that the deceased was on the shoulder of the highway when struck by the cab.

*Wright v. South Carolina Power Co.,* 205 S. C. 327, 31 S. E. (2d) 904, was relied upon by the court in its order granting judgment for the respondents. However, it involved the death of a pedestrian when struck by a city bus on a street (not sidewalk or shoulder) between intersections and there was no evidence of negligence in the operation of the bus.

The North Carolina court holds that violation of their statute (which is similar to our Sec. 46-435) by the failure of a pedestrian on the highway to yield the right of way to a vehicle does not constitute contributory negligence *per se,* but rather is evidence of negligence to be considered with the other evidence in the case in determining whether the pedestrian is chargeable with negligence which proximately caused or contributed to his injury. *Citizens Nat. Bank v. Phillips,* 1952, 236 N. C. 470, 73 S. E. (2d) 323. *Simpson v. Curry,* 1953, 237 N. C. 260, 74 S. E. (2d) 649. Reference to these cases is particularly appropriate because of the lower court's and respondents' reliance upon the earlier decision of *Tysinger v. Coble Dairy Products,* 1945, 225 N. C. 717, 36 S. E. (2d) 246. In it the pedestrian was struck by the side of a truck near the center of the highway.

Verdicts for plaintiffs were affirmed in *Pueblo Transp. Co. v. Moylan,* Colo., 1951, 226 P. (2d) 806, 808, in which a similar ordinance was involved, requiring pedestrians to yield the right of way. The court said: "The requirement of the ordinance that the pedestrian yield the right of way to vehicles does not create an absolute, but only a relative, right in favor of the driver. It establishes the rule of precedence when rights might otherwise be balanced. * * * The test of the (contributory) negligence of plaintiffs was the rule of reason and again constituted a question of fact to be determined by the jury."

In *Seahorn v. Karr,* 1951, 35 Tenn. App. 38, 242 S. W. (2d) 331, 334, with respect to a like statute it was said: "Under the Statute, a pedestrian who undertakes to cross a street or highway at any point other than a pedestrian crossing, cross-walk or intersection must yield the right of way to vehicles. This does not mean, however, that the driver of a vehicle is relieved of the duty of maintaining a reasonable lookout for pedestrians between intersections. On the contrary, as in the case of pedestrians crossing at intersections, * * * the precedence given by statute to vehicles traveling between intersections is relative and, to quote * * *, 'only has the effect of turning the scales where the rights of the parties are balanced'."

In *Allanson v. Ceynar,* 1938, 203 Minn. 93, 280 N. W. 6, plaintiff was struck by a car at night when he stood on shoulder of highway. Held not guilty of contributory negligence as a matter of law. No statute appears to have been involved. *Minacci v. Logudice,* 1940, 126 Conn. 345, 11 A. (2d) 354, 355, was also upon facts similar to those of the case at bar. The trial court set aside verdict for plaintiff upon ground that she did not look with care for the approaching car. The evidence was in conflict as to whether the collision was on the concrete roadway or on the shoulder, as plaintiff testified. Reversed and verdict reinstated: "The point * * * was not whether the plaintiff was negligent as a matter of law in failing to look or to see * * * as she proceeded across the traveled portion of the highway, but rather whether, after reaching the north shoulder or the grass beyond, she was negligent as a matter of law either in what she did or failed to do under the circumstances. * * * Whether she was contributorily negligent was a question for the jury."

The following was quoted with approval (from an earlier Pennsylvania case) in *Burkleca v. Stephens,* 1952, 370 Pa. 371, 88 A. (2d) 57, 59, in which verdict for pedestrian on right side of country road was affirmed: " 'In the absence of sidewalks the rights of pedestrians upon the highway are

equal to those of motor vehicles; and a pedestrian walking along the right side of a paved roadway is not required to turn and look for approaching traffic (citing cases); nor is he required to step off the highway to permit the automobile to pass * * *. In our opinion the plaintiffs are clearly not guilty of contributory negligence as a matter of law'."

In *Hanson v. Eilers*, 1931, 194 Wash. 185, 2 P. (2d) 719, judgment was affirmed for plaintiff who was walking on right shoulder of road when law required that he walk on left; but there was evidence that the defendant drove his car off the paved portion of the road and struck plaintiff. It was expressly found that there was no contributory negligence.

There was cited in the order granting judgment n.o.v. in the case at bar *Saindon v. Lucero*, 10 Cir., 1951, 187 F. (2d) 345. It was a very different case from this. The facts were undisputed and it was tried by the judge without a jury. He granted judgment for plaintiff which was reversed on appeal on the ground of contributory negligence. There the deceased pedestrian was seen by the defendant motorist forty or fifty feet ahead, in the center of the road. Defendant applied his brakes and swerved to the right. The decedent immediately stepped into defendant's lane of travel and was struck. An element of contributory negligence which was found by the appellate court was that deceased moved "quickly in front of" defendant's car.

In the brief of respondents is cited *Crawley v. Hill*, 1948, 253 Wis. 294, 34 N. W. (2d) 123, 125. There the deceased pedestrian was struck by the car six feet and one inch within the edge of the highway. He had run out into the road and did not yield the right of way as required by statute similar to ours. The court said: "This is not a case where the pedestrian was on the highway for a period long enough to have been seen by the driver in time to have avoided hitting him."

Also cited in the brief is *Lang v. Rogney*, 8 Cir., 1953, 201 F. (2d) 88. The court's view of the facts there was

that they conclusively showed that the pedestrian was not on the shoulder but on the concrete portion of the highway when struck by defendant's car. While judgment for plaintiff was reversed, the case was remanded for a new trial under the applicable Wisconsin law of comparative negligence. It is the further Wisconsin view that, under a statute similar to ours, a pedestrian, jay-crossing a highway, who does not yield the right of way to a vehicle, is guilty of contributory negligence as a matter of law. It was held that the defendant's testimony that he did not see the pedestrian-plaintiff until he was about forty or fifty feet away was evidence of defendant's negligence with respect to the lights on his car. In the case in hand the driver of the car testified that he did not see the deceased until within five or six feet of him. The verdict established that his conduct was not consistent with due care in the operation of the cab; and the trial court concluded, at least *arguendo,* that there was evidence reasonably susceptible of inference of negligence of the driver.

The following is quoted from 2 A. Blashfield's Cyclopedia of Automobile Law and Practice 194, Sec. 1291. Right of Way:

"Under the common law a pedestrian and the driver of an automobile have equal rights to the use of a public street and the pedestrian is free to cross the street wherever he wishes. Modern legislative planning has modified this rule. Statutes and ordinances generally give vehicles the right of way between crossings over pedestrians, though such a regulation is to be construed reasonably, and requires the pedestrian to yield his equal rights in the street only when necessity requires it to prevent stopping a vehicle. As it is stated in some cases, the right of way of the motorist is not an absolute one and the pedestrian is not absolutely prohibited from crossing. The statutory rule on right of way does not relieve the driver of an automobile of his duty of exercising reasonable care. The right of way being statutory the area included in the rule depends on the wording

and construction of the legislation involved. Thus, it has been held that it is not limited to city streets but includes highways in the open country. Cases of this nature present special problems where the accident happens on graveled shoulders. In a case decided by a District Court of Appeal of California, where there was a macadamized strip 20 feet in width, it was held that the right of way rule was limited to that strip."

Sec. 1291.5.  Care Required of Motorist:

"Automobile drivers are not held to the same high degree of care at points between intersections as at regular crossings; not being under the same obligation to anticipate the presence of pedestrians between crossings as at the regular crossings provided for them. Notwithstanding this rule, however, the driver of an automobile is bound at all times to keep within the speed limits and to exercise ordinary care as to pedestrians discovered in his path at other places than crossings, and when a driver sees, or with reasonable care may see, a pedestrian in time to avoid a collision with him, he must do so, and, if he does not, he is liable for resulting injury."

It is not necessary for the purpose of this decision that we consider further the apparently conflicting rules with respect to statutes similar to ours, which are illustrated by the foregoing decisions of other courts, or that we discuss in more detail the former decisions of this court which have been cited; here we need only decide, than which we go no further, that the statutory requirement that a pedestrian yield the right of way does not mean that he must vacate the shoulder of a highway in order to escape collision with a vehicle which leaves the main traveled portion (here concrete), or else be held to have been guilty of contributory negligence as a matter of law. The evidence here, particularly the pictures, showed that at the point of impact there was negligible space between the asphalt shoulder and a drainage ditch or gully; immediately beyond that was a steep enbankment which one witness esti-

mated to be fifteen or twenty feet high. Thus, it may be inferred that further yielding of the right of way than to get or remain on the shoulder required in this case that the pedestrian-decedent get in the ditch or climb the enbankment, which is manifestly more than is reasonably requisite in order to comply with the statute and yield the right of way to an approaching vehicle.

The order granting judgment *non obstante veredicto* is reversed, and the verdict is reinstated for entry of judgment thereupon.

Reversed.

TAYLOR, OXNER and LEGGE, JJ., and JOSEPH R. Moss, Acting Associate Justice, concur.